UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELAINE MARY MURPHY,<br><br>Petitioner,<br><br>v.<br><br>WILLIAM MILLIGAN SLOAN,<br><br>Respondent. | Case No. 13-cv-04069-JST<br><br>**ORDER DENYING PETITION FOR RETURN PURSUANT TO THE HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION**<br><br>Re: ECF No. 1 |

Before the Court is the petition filed by Elaine Murphy ("Murphy") for the return of her daughter E.S. to Ireland pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 19 I.L.M. 1501 ("Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), codified at 42 U.S.C. § 11601, *et seq.* ECF No. 1.

The Court has considered each of the declarations submitted by Murphy and Respondent William Sloan ("Sloan"), including the sworn declarations they submitted in support of and opposition to Murphy's request for a preliminary injunction; the Verified Petition; and the Response to the Petition. The Court also received testimony and documentary evidence at an evidentiary hearing held October 7, 2013; the direct testimony of the parties was introduced via additional sworn declarations, and the parties were cross-examined. The Court also admitted and considered the depositions of percipient witness Ahmed Abbas and expert witness Jeremy Morley. The Court also considered the parties' trial briefs.

Having considered the evidence carefully, the Court now finds that E.S. was, at the time of the alleged wrongful retention, and now remains, a habitual resident of the United States, and denies the petition.

## I. FACTS

At all times relevant to this proceeding, Sloan has resided in Mill Valley, Marin County, California. Sloan and Murphy were married in the year 2000 in California, where they were then living. Murphy is a citizen of Ireland; Sloan is a citizen of the United States.

E.S. was born in 2005, during the marriage, also in California. She attended preschool in Marin County.

In approximately October of 2009, Sloan advised Murphy that he felt their marriage was at an end, and he moved to a different bedroom in their house.

Initially, the parties continued to plan for E.S. to continue residing in Mill Valley. In January 2010, they enrolled E.S. to begin kindergarten in a private school called Greenwood School. Their decision to enroll her there was a joint one. In February 2010, Sloan purchased a smaller house, also in Mill Valley but closer to downtown Mill Valley and the Greenwood School, so that E.S. could live in one home with him and the other home with Murphy. He made this purchase with Sloan's knowledge and consent.

In March 2010, Murphy proposed moving with E.S. to Ireland so E.S. "could experience going to school in Ireland," and so Murphy could obtain a master's degree in fine arts from University College Cork. Murphy and Sloan discussed the move to Ireland as a "trial period."[1] Consistent with this characterization, Sloan sent an e-mail to the Greenwood School, letting them know that E.S. would be moving to Ireland, but that she would return to the United States (and Greenwood) if the "Irish rain becomes unbearable." Sloan also sent an e-mail on September 2, 2010 to the student registration office at the Mill Valley School District, the public school district which E.S. was entitled to attend, in which he stated, "This was very last minute, but we decided to try living in Ireland for a year (Elaine is from there), so [E.S.] has started Kindergarten there." The couple agreed to rent out the second Mill Valley home so Murphy would have accommodations when she returned to California, and so she could store her belongings in the

---

[1] Murphy now claims that she always intended to live in Ireland permanently with E.S.; if so, she did not share that intention with Sloan.

2

second home, which she did. The items she stored included clothing, bedding, linens, pillows, curtains, pots, pans, cookware, cups, plates, art supplies, books, and artwork.

In August 2010, Murphy moved to Kinsale, Ireland with E.S. The parents enrolled E.S. in Summercove School there. Beginning in October 2010, Murphy and E.S. lived in a rental home in Kinsale, Ireland called "Rathgale." Sloan paid the rent.

Sloan filed for divorce in Marin County Superior Court on October 25, 2010, and served Murphy shortly thereafter.

Murphy has a boyfriend named Ahmed Abbas. Abbas and Murphy became friends sometime in 2009, and the relationship developed into a romantic one at some point between 2009 and when Petitioner moved to Ireland in 2010. Abbas lives in Sri Lanka and spends a significant amount of time in the Maldives, where he is a part owner of the Full Moon Sheraton luxury resort. Abbas is generous to Murphy, and gives her money whenever she asks for it. Although he characterizes these transfers as loans, Abbas does not keep track of how much money he gives her or inquire as to its use. Particularly in light of Abbas' testimony that he offered to purchase a house and put the title in Murphy's name, *infra*, the Court finds that Abbas' testimony that the money he gives Murphy is intended as a loan is not credible; that the money is intended as a gift; and that Murphy depends for support either on Sloan, who lives in the United States, or on Abbas, who lives in Sri Lanka and the Maldives.

E.S. attended school in Ireland for the 2010, 2011, and 2012 scholastic years. In addition to her regular academic school, she also attended a dance academy. E.S. speaks Gaelic as well as English. In each of those years (up to and including Spring 2013), E.S. returned to the United States for vacations in February, April, summer, Halloween, and Thanksgiving.[2] The majority of those visits were spent in Mill Valley, but some of them were spent on the East Coast with Sloan's extended family. At Christmas, E.S. would remain in Ireland, and Sloan visited her and Murphy there.

In March 2013, Murphy applied to graduate school at Oxford University, which is located

---

[2] In one year, E.S. spent the spring vacation skiing with her father in Switzerland.

3

in Oxford, England. Murphy also considered applying to graduate programs in California "as recently as October 2012," when she visited the San Francisco Art Institute and California College of the Arts with Sloan. In the last two years, Murphy has expressed interest in applying to fine art degree programs at Yale University, NYU, UCLA, and Rhode Island School of Design, three of which are located on the East Coast of the United States, and one of which is located in Southern California.

In April 2013, Rathgale became uninhabitable. That fact is undisputed; Murphy further contends that she was unable to find any other lodgings for herself and E.S. in Kinsale, and so she left the country, as described more fully below. The Court finds that there were other accommodations available in and around Kinsale. Nonetheless, on April 18, 2013, Petitioner left for the Maldives with E.S., where Abbas was located, without previously informing Sloan or obtaining his consent. Sloan attempted to contact Murphy in a number of ways, including through her family in Ireland. Murphy did not respond until April 23, 2013, to tell Respondent that E.S. was "totally fine."[3]

On May 1, 2013, after Murphy had taken E.S. to the Maldives for thirteen days without Sloan's knowledge or consent, Sloan wrote Murphy an e-mail asking when E.S. would return to Ireland to resume school. He stated: "If you do not tell me when you are going to get back to Ireland, I am going to start looking into getting her into school here in California for the remainder of the year, and I will come pick her up if I have to."

On May 2, 2013, Sloan wrote to Murphy twice, still attempting to find out when she planned to return to Ireland. In his second e-mail, he sent Murphy some links to a number of rental units in Ireland that were available furnished and within walking distance to E.S.'s school. Murphy's only response was to ask Sloan to review the draft of a paper she had written for her graduate school.

---

[3] The parties introduced a great deal of evidence regarding this trip. Because most of it was not necessary to the Court's decision, it is not summarized here. The Court emphasizes that the purpose of this proceeding is not to determine custody, but only E.S.'s habitual residence and whether there has been a wrongful retention.

1   Murphy testified that while Sloan was sending e-mail messages expressing anxiety and
2   concern over E.S.'s absence from school and Murphy's lack of a plan for returning to Ireland, he
3   was simultaneously having phone conversations with Murphy in which he told her — contrary to
4   the e-mail communications — that "everything was fine." This testimony was not credible.

5   During this time, E.S. was missing school in Ireland. Petitioner did not return until May 7,
6   2013.

7   When Murphy returned to Ireland, she rented a home called The Boathouse on a week-to-
8   week basis. She stayed there with E.S. during portions of May and June, 2013. Murphy knew
9   when she rented the house that her tenancy was subject to cancellation at the end of any given
10  week.

11  On June 12, 2013, Sloan arrived in Ireland. His plan was to celebrate E.S.'s birthday on
12  June 13, depart Ireland on June 16, then return to Ireland on June 26 to take E.S. back to
13  California with him for the summer. On June 12 — the day Sloan arrived — Murphy received a
14  telephone call from her landlord stating that Murphy could no longer stay at The Boathouse and
15  would have to leave. Having nowhere else to stay in Kinsale, Murphy told Sloan that she would
16  again leave for Asia with E.S. Sloan objected strenuously to E.S. not being able to finish the
17  school year in Ireland, and pleaded with Murphy to stay in Kinsale at least until E.S. could finish
18  the school year — either to stay with her relatives, of whom she has more than one, or in a hotel,
19  which Sloan would pay for. Sloan also suggested that, if Murphy was unwilling to stay in Kinsale
20  herself, that she at least permit E.S. to stay in Kinsale with relatives to finish school. Murphy
21  refused to consider any of these alternatives. Because of Murphy's prior trip to the Maldives, and
22  the fact that E.S. had already been absent from her school a total of nineteen days, Sloan was
23  concerned that this additional, unplanned absence at the end of the school year would be harmful
24  to E.S.

25  Because Murphy refused to keep E.S. in school, and because his prior work commitments
26  prevented him from remaining in Ireland until E.S.'s semester was scheduled to end
27  approximately two weeks later, Sloan took E.S. with him to the United States when he left on June
28

5

16. Sloan told Murphy that he had purchased a one-way ticket for E.S. and that she would thereafter be attending school in Mill Valley.[4] Murphy did not object. She responded by indicating the she was applying to graduate programs at Oxford University and in the United States. The next day, she left Ireland to visit Abbas in the Maldives, and she spent much of the summer either there or in Sri Lanka.

While the parties dispute what conversations took place in Ireland in June 2013, they agree that on June 21, 2013, Sloan told Murphy that he did not intend to return E.S. to Ireland. Murphy told Sloan that, if E.S. was going to live in the United States, she would move next to him in Mill Valley, and that he should buy a house next door to his own.

Murphy's actions in June 2013 demonstrate a lack of attachment to Ireland and a lack of settled intent to remain in Kinsale or in Ireland.

Murphy took no action to compel E.S.'s return to Ireland until September 3, 2013, when she filed this action. Even though there was already a pending Marin County Superior Court dissolution action, she neither sought an emergency custody order from that court nor filed a Hague Convention action in this one. In point of fact, at the moment of the June 12 and June 21 conversations, neither Murphy nor E.S. had a home in Ireland. Murphy and E.S. did not have a fixed address there, and E.S. was not enrolled in school for the following year. Murphy did not reacquire a fixed address in Ireland until September 9, 2013, after she had already initiated these proceedings and more than two weeks after the beginning of the school year at E.S.'s former school in Ireland. Murphy had no plan to pursue a particular occupational or academic endeavor after completing her master's degree. On October 4, 2013, she received her Master's Degree. She no longer has any attachment to Ireland in terms of work or schooling. She has not been gainfully employed in Ireland at any time relevant to this proceeding. She had no means of support within Ireland.

On August 29, 2013, E.S. began third grade at Strawberry Point School in Mill Valley.

---

[4] In her testimony, Murphy acknowledged that she agreed to allow Sloan to take E.S. back to the United States. She denies that he told her he would enroll her in school in Mill Valley. As set forth above, the Court credits Sloan's version of events.

6

1  E.S.'s primary care physician and dentist are located in the Bay Area.  E.S. has never gone to the
2  doctor for check-ups, or gone to the dentist, in Ireland.
3      On September 3, 2013, Murphy filed this action.
4      On October 4, 2013, the Marin County Superior Court entered a judgment of dissolution,
5  and the parties are no longer married.  The state court dissolution action is still pending, however,
6  for the purposes of making further orders regarding child custody, child support, and spousal
7  support.
8      The reason that Murphy has not purchased a more permanent home in Ireland, or entered
9  into a longer-term lease, is not a lack of resources.  Abbas has offered to purchase her a house with
10 his funds, but putting her name on the title.[5]  Murphy testified that she "hasn't really discussed
11 with" Abbas his purchasing a house for her.  The Court believes Abbas' testimony, does not
12 believe Murphy's testimony that she "hadn't really discussed" the subject with Abbas (her
13 testimony at trial) or that she could not recall whether she had discussed it (her testimony at
14 deposition), and believes that Murphy knew when she testified that her answers were not factually

---

[5] Abbas' testimony at deposition was as follows:

> Q. Is there some reason that you have not bought Elaine a house in Ireland, since she wants to live there permanently and she's had all of these terrible struggles maintaining a house there?
> A. We have not come across the right house, I should say, you know.  Because you have to come across the right property to buy, you know, but we always have the idea of buying a place.
> Q. Has she asked you to buy her a house in Ireland?
> A. Not that she asked.  I suggested that I should buy her a house, you know.
> Q. And she would be the owner of it?
> A. Definitely.
> Q. So you would buy it, but she would be the owner and she would live there.  Is that right?
> A. Yes.
> Q. Do you have –
> A. It will not be on my name.
> Q. I'm sorry?
> A. It will not be on my name; it will be on her name.
> Q. Okay.  And who would make the mortgage payments?
> A. I would make the mortgage payments.

7

accurate. The Court has taken that fact into account in assessing Murphy's credibility.

At the time of the allegedly wrongful retention, Murphy had not enrolled E.S. in school for the following year, and Murphy was not allowing E.S. to complete school in Ireland for the 2012-13 school year.

Murphy has a California driver's license, but not an Irish one.

Both Abbas and Murphy testified that they do not communicate by e-mail and that they communicate only by telephone. Murphy was ordered by stipulation to produce a variety of e-mails between her and Abbas, but she did not look for any such e-mails on the ground that none could exist. However, an e-mail from Abbas to Murphy was produced in the case (by Sloan) and attached as an exhibit to Abbas' deposition. From the content of the e-mail, it appears to be a response to an e-mail Murphy sent to Abbas. While it is possible that this e-mail exchange is the only relevant e-mail exchange between Murphy and Abbas, the Court finds that it is more likely that there were other relevant e-mail messages and that Murphy intentionally failed to search for them as she was obligated to do. The Court considered this failure in evaluating Murphy's credibility.

Sloan never acquired the settled intent that E.S. reside permanently in Ireland. Murphy never acquired the settled intent to reside in Ireland, either with or without E.S.

The Spring of 2010 was the last time that Sloan and Murphy had a shared, settled intent regarding E.S.'s habitual residence. That intent was that she reside in California, in the United States.

## II.     JURISDICTION

This Court has jurisdiction over actions brought under the Hague Convention through ICARA. See 42 U.S.C. § 11601 et. seq.

## III.    CONCLUSIONS OF LAW

The Hague Convention on the Civil Aspects of International Child Abduction "was adopted in 1980 in response to the problem of international child abductions during domestic disputes [and] . . . seeks to secure the prompt return of children wrongfully removed to or retained

in any Contracting State[.]" Abbott v. Abbott, 560 U.S. 1, 130 S.Ct. 1983, 1989 (2010) (internal quotation marks omitted). "The Convention's central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must order the return of the child forthwith, unless certain exceptions apply." Id. (citation and internal quotation marks omitted).

"[T]he Hague Convention analysis is *not* a determination of custody rights." Shalit v. Coppe, 182 F.3d 1124, 1128 (9th Cir. 1999). "The Convention . . . empower[s] courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4). See also Cuellar v. Joyce, 596 F.3d 505, 508 (9th Cir. 2010) ("A court that receives a petition under the Hague Convention may not resolve the question of who, as between the parents, is best suited to have custody of the child. With a few narrow exceptions, the court must return the abducted child to [his or her] country of habitual residence so that the courts of *that* country can determine custody.").

A petitioner seeking return of a child under the Convention must prove by a preponderance of the evidence that the child "was wrongfully removed or retained" within the meaning of the Convention. 42 U.S.C. § 11603(e)(1)(A). A "wrongful removal or retention" involves a breach of the non-removing parent's "rights of custody," which includes the right to care for the child and determine his or her place of residence. The right at issue must (1) arise under "the law of the state in which the child was habitually resident immediately before the removal and retention"; (2) have been "actually exercised" at the time of the removal or retention; and (3) relate to a child under the age of sixteen. If the foregoing elements are proven, the court must "order the return of the child forthwith." Abbott, 130 S.Ct. at 1991.

In determining whether a wrongful removal or retention has occurred, courts in the Ninth Circuit must answer four questions: "(1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? And (4) Was the petitioner exercising those rights at the time of the

removal or retention?" Mozes v. Mozes, 239 F.3d 1067, 1070 (9th Cir. 2001).

The most important inquiry under the Convention is the state of the child's habitual residence. Asvesta v. Petroutsas, 580 F.3d 1000, 1017 (9th Cir. 2009). Determination of "habitual residence" is described by the Hague Conference as a question of "pure fact." Mozes, 239 F.3d at 1071. The Hague Conference left the term undefined by design, in order to "leave the notion free from technical rules which can produce rigidity and inconsistencies as between different legal systems." Id. (quoting J.H.C. Morris, Dicey and Morris on the Conflict of Laws 144 (10th ed. 1980)).

> Although the term "habitual residence" is intentionally left undefined in the Convention, we have developed an analytical framework to provide "intelligibility and consistency" in the determination of a child's habitual residence. Thus, in determining whether a child has acquired a new habitual residence, we first ask whether there is a settled intention to abandon a prior habitual residence. In this inquiry, the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence. Here, as in most cases, those persons are the parents.

Papakosmas v. Papakosmas, 483 F.3d 617, 622 (9th Cir. 2007) (citations and quotations omitted). Thus, in determining the child's habitual residence, the Court first seeks to determine the joint settled intention of the parents. Mozes at 1075 ("[T]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind.").

"Thus, in determining whether a child has acquired a new habitual residence, we first ask whether there is a settled intention to abandon a prior habitual residence." Papakosmas, 483 F.3d at 622 (citing Mozes, 239 F.3d at 1075). "[T]he agreement between the parents and the circumstances surrounding it must enable the court to infer a shared intent to abandon the previous habitual residence." Mozes, 239 F.3d at 1081. The cases "demonstrate the importance of a shared parental intent in deciding the issue of habitual residence of a child lacking the capacity to form his or her own intentions concerning residency." Whiting v. Krassner, 391 F.3d 540, 548 (3d Cir. 2004).

### A. Shared Settled Intent

Consistent with the foregoing, the Court has examined the facts for evidence of shared

settled intent on the part of E.S.'s parents regarding her residence. "Federal courts have considered the following factors as evidence of parental intent: parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence." Maxwell v. Maxwell, 588 F.3d 245, 252 (4th Cir. 2009) (citing cases) (footnotes omitted).

Applying these factors, the Court finds that the parties never had a "shared settled intent" that E.S.'s habitual residence would be Ireland. Rather, the Court finds that Murphy's move to Ireland with E.S. was intended as a "trial period," and that E.S. never abandoned her habitual residence in the United States. E.S. has retained many close ties to the United States, both to her community in Mill Valley, California and to Sloan's extended family in the United States. E.S. has Irish citizenship, but she has never renounced her United States citizenship. Even though Murphy had the means to purchase a home in Ireland, or even to establish a long-term leasehold, she had no fixed residence in Ireland as of the date of the wrongful retention. She does, on the other hand, have a home waiting for her in the United States that was purchased with her knowledge and consent. She does not have a marital relationship to anyone in Ireland; while she has a long-term boyfriend, he lives in Sri Lanka and the Maldives (where she spends a significant amount of time, both with and without E.S.). While Murphy denigrates the value or importance of the possessions she has stored in California, the fact remains that she has many possessions stored there. More importantly, so does E.S., whose possessions are not in storage, but inside the house where she lives part of the year with Sloan. These facts in the aggregate compel the Court to conclude with a high degree of conviction that Murphy and Sloan never had the shared, settled intent to shift E.S.'s habitual residence from the United States to Ireland.

The fact that E.S. had lived for much of each of two-and-a-half years in Ireland at the time of Sloan's alleged retention does not necessarily mean that her habitual residence had changed. In the case of Re A (Wardship: Jurisdiction), 1 F.L.R. 767, 773 (Eng. Fam. Div. 1995), a case cited

11

by the Mozes court, the child lived in England for the first two years of her life, then Pakistan for four years, then England for two years, after which the parents agreed that child should attend school in Pakistan for two years while living with the father's relatives. After approximately one year of the alleged agreement, the mother sought return of the child to England. Although the child by that point had spent more than half her life in Pakistan, the court held that the parties' agreement was "temporary and conditional," and not sufficient to change the child's habitual residence.

Similarly, in Mozes, the court found that the children had not abandoned their habitual residence in Israel even though the father lived with the children in the United States for a "very full year" in which the children "were enrolled and participating full time in schools and social, cultural, and religious activities. They had successfully completed a year of school in the United States, quickly learned English, made new friends, and were accustomed to and thriving in their new life in Beverly Hills." Id. Unlike the case at bar, in which E.S. returned to the United States frequently throughout the year, in Mozes there was no evidence that the children frequently returned to Israel. Nonetheless, the Ninth Circuit considered the children's' year in the United States akin to an "academic year abroad." "[T]he ordinary expectation — shared by both parents and children — is that, upon completion of the year, the students will resume residence in their home countries. If this were not the expectation, one would find few parents willing to let their children have these valuable experiences." Id. at 1083. The same can be said here.

### B. Acclimatization

Murphy correctly argues that the parents' shared intent is not always dispositive, because there are circumstances in which the length of time a child resides in a new country by itself can be sufficient to change the child's habitual residence, in a process called "acclimatization."

The Ninth Circuit has explained that acclimatization occurs only in a limited set of circumstances. First, "[w]hen a child has no clearly established habitual residence elsewhere, it may become habitually resident even in a place where it was intended to live only for a limited time." Mozes, 239 F.3d at 1082 (footnote omitted). Second, a child's residence may change by

1 the passage of time "if the child's prior habitual residence has been effectively abandoned by the
2 shared intent of the parents." Id. In the absence of either of these circumstances, however, "a
3 prior habitual residence should be deemed supplanted *only where "the objective facts point*
4 *unequivocally"* to this conclusion." Id. (emphasis added). To satisfy this test, the Court must be
5 able to "say with confidence that the child's relative attachments to the two countries have changed
6 to the point where requiring return to the original forum would now be tantamount to taking the
7 child 'out of the family and social environment in which its life has developed.'" Id. at 1081
8 (citing Elisa Perez-Vera, Explanatory Report ¶ 11, in 3 Hague Conference on Private International
9 Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982)).

10 The first two sets of circumstances that might support acclimatization clearly are not
11 present here, and neither party argues that they are.

12 Turning to the third category, the Court finds that Murphy has not met her high burden of
13 demonstrating that "the objective facts point unequivocally to [E.S.]'s habitual residence being in"
14 Ireland. Murphy points to E.S.'s enrollment in an Irish school, her development of friends in
15 Kinsale, her celebration of holidays with E.S.'s family, her participation in a dance academy, and
16 her learning the Gaelic language as evidence of her acclimatization. There is no question that E.S.
17 has developed ties and relationships in Kinsale. The Ninth Circuit has "caution[ed, however,] that
18 acclimatization should not be confused with acculturation; the question more generally is whether
19 [Ireland] had supplanted California as the locus of [E.S.]'s development." Papakosmas, 483 F.3d
20 at 627 (citing Holder v. Holder, 392 F.3d 1009, 1019 (9th Cir. 2004)). Here, E.S. maintains
21 substantial family, cultural, and developmental ties to the United States. She celebrates
22 Halloween, Thanksgiving, and Easter in the United States. She maintains a relationship with
23 Sloan's extended family. She maintains a community in Mill Valley, where she spends each
24 summer. She receives her dental and medical care in California as well. Considering the totality
25 of the evidence, and while the Court does not minimize the attachments E.S has developed to
26 Kinsale, the Court find that these attachments "did not shift the locus of [E.S.'s] development and
27 that any acclimatization did not overcome the absence of a shared settled intention by the parents
28

1 to abandon the United States as a habitual residence." Id.

2 This case resembles Ruiz v. Tenorio, 392 F.3d 1247 (11th Cir. 2004), in many significant respects. In that case, the parents originally lived in Minnesota, then moved to Mexico with their two minor children, who at the time were then seven and two years of age. The move was intended as a "trial period," and it was stated that the parties would move back to Minnesota. Id. at 1249. The family stayed in Mexico for two years and ten months; during that time, the mother returned to the United States to visit twice with the children, and once by herself. On one trip, the mother opened a bank account in Florida; on the second, she obtained a nursing license there. Id. at 1250. After approximately two years, the couple separated but the mother remained in Mexico with the children. Some months later, however, she took the children to the United States and told the father that she would not return them to Mexico. Id.

Applying the test set forth in Mozes, the Eleventh Circuit affirmed the district court's finding that there had been no shared settled intent to shift the children's habitual residence to Mexico, and also found that the children had not become acclimatized. The Ruiz court's conclusions apply equally here:

> It is true that the children in the instant case remained in Mexico for a considerable period of time and that there was some evidence of their acclimatization; for example, they went to school, had social engagements, and took lessons. However, we agree with the Mozes court that "in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned." We also agree with the Mozes court that "when there is no settled intent on the part of the parents to abandon the child's prior habitual residence," courts should be hesitant to find a change in habitual residence unless objective facts point unequivocally to a change or the court can "say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount" to changing the child's family and social environment in which its life has developed.

Ruiz, 392 F.3d at 1255 (citations omitted). Here, E.S. maintained ties to the United States that were much more robust than those of the children in Ruiz. The Court finds that E.S.'s habitual residence in the United States was never "abandoned," and that Murphy therefore has not shown that E.S. has acclimatized to Ireland.

**CONCLUSION**

For the foregoing reasons, the Court concludes that Sloan's retention of E.S. was not wrongful, and Murphy's petition is DENIED. The preliminary injunction entered September 12, 2013, is DISSOLVED. The clerk is ordered to return E.S.'s passports to Respondent. Respondent is ordered to submit a form of judgment to the Court within 10 days of this order.

**IT IS SO ORDERED.**

Dated: October 16, 2013

_____
JON S. TIGAR
United States District Judge